IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

JOE OAKLEY et al.,                )
                                  )
      Plaintiffs,                 )
                                  )
v.                                )      No. 06-2276 D/P
                                  )
CITY OF MEMPHIS,                  )
                                  )
      Defendant.                  )

_____

REPORT AND RECOMMENDATION
_____

        Before the court by order of reference is plaintiffs' Renewed
Motion for Summary Judgment.[1]   (D.E. 68.)   Defendant City of
Memphis ("City") filed a response in opposition, and plaintiffs
filed a reply.   Subsequently, plaintiffs filed a Submission of
Supplemental Authority in Further Support of Renewed Motion for
Summary Judgment, and the City filed a response to plaintiffs'
Submission of Supplemental Authority.

        Based on the entire record, the court submits the following
proposed findings of fact and conclusions of law, and recommends
that plaintiffs' Renewed Motion for Summary Judgment be granted.

I.   PROPOSED FINDINGS OF FACT

A.   Procedural History

        This lawsuit involves claims brought by a group of forty

_____

[1]The motion was referred to the Magistrate Judge for a report and
recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).

Caucasian and African-American police officers who allege that the City discriminated against them on the basis of race with respect to promotions within the Memphis Police Department ("MPD"), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. §§ 1981 and 1983, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-401 et seq.[2]  At the time this lawsuit was filed in 2006, all of the plaintiffs held the rank of lieutenant within the MPD.  Plaintiffs allege that on January 24, 2005, Larry A. Godwin, the Director of the MPD, announced through an "Information Bulletin" that the MPD would be promoting eligible lieutenants to the rank of major ("2005 Major Promotional Process").  (Am. Compl. ¶ 7.)  The lieutenants were informed that the promotions would be based on their performance on an examination, which would contain three components (collectively "2005 Major Examination"): (1) a Written Job Knowledge Test; (2) an In-Basket Exercise; and (3) an Oral Presentation Exercise.[3]  (Id. ¶ 8.)

---

[2]On May 5, 2006, plaintiffs filed a complaint alleging violations of 42 U.S.C. §§ 1981 and 1983.  After receiving their right-to-sue letters, they filed an amended complaint alleging violations of Title VII and the THRA on August 18, 2006.  Courts apply the Title VII framework to claims under 42 U.S.C. §§ 1981 and 1983, and the THRA.  See Oakley v. City of Memphis, 315 F. App'x 500, 502 n.1 (6th Cir. 2008) (citing Sperle v. Mich. Dep't of Corr., 297 F.3d 483, 490 (6th Cir. 2002); Isabel v. City of Memphis, No. 01-2533, 2003 WL 23849732, at *1 (W.D. Tenn. Feb. 21, 2003)), vacated on other grounds, 129 S. Ct. 2860 (2009).

[3]The Information Bulletin described the three components as follows:

Plaintiffs completed the examination in May of 2005.[4]   On

---

1.   <u>Written Job Knowledge Test</u>

The Job Knowledge Test is a written multiple-choice test.  Each question on the test is based on a specific reading source.  The title of the source will appear in the test immediately preceding the questions based on that source.  Items for the test will be taken from the reading sources listed in the [MPD] Major Promotional 2005 Test Preparation/Study Guide.

2.   <u>In-Basket Exercise</u>

Through written instructions candidates will be provided with a scenario including a specific task.  Each candidate will be provided with a test booklet containing multiple-choice questions and a separate packet of review material.  Candidates will need to review and organize the material and answer the multiple-choice questions during the allotted time limit.

3.   <u>Oral Presentation Exercise</u>

The Oral Presentation Exercise is an individual exercise in which each candidate will assume the role of someone in the rank of a Major.  Candidates will be provided with a set of materials to review and organize.  Candidates will be allowed a period of time to make an oral presentation which will be audio-recorded.

(Am. Compl. Ex. A.)

[4]One of the plaintiffs, Richard Borgers, did not take the examination in May of 2005, and subsequently was denied the opportunity to take the examination for "the illegal reasons" described in the complaint.  (Am. Compl. ¶ 14.)  However, the parties previously stipulated that "[a]ll Plaintiffs applied for and met the minimum qualifications for the rank of Major, a position for which Defendant was seeking applicants."  (Joint Statement of Undisputed Material Facts ¶ 20.)  The City has never taken the position that Borgers should be treated any differently from the other plaintiffs.

November 22, 2005, Director Godwin informed all of the lieutenants that based on "serious concerns" regarding the validity of the examination and the results, all examination results were being rejected, the 2005 Major Promotional Process would be closed, and no action would be taken on promoting lieutenants to majors until 2007. (<u>Id.</u> ¶ 11.) According to the complaint, the City's Director of Human Resources, Dr. Lorene Essex, "stated that the Examination was 'tossed out' because the list of the highest scorers was unfairly balanced in that not enough minority officers scored well enough to be promoted." (<u>Id.</u> ¶ 12.) The complaint further alleges that "Agents of the City also stated that the decision to cancel the promotion process was based on the belief that the City would be sued if it promoted based on the Examination results, as the written test clearly had a disparate impact on African American promotional candidates." (<u>Id.</u> ¶ 13.)

After engaging in discovery, plaintiffs and the City filed cross-motions for summary judgment. As part of their cross-motions, the parties filed a Joint Statement of Undisputed Material Facts. On September 4, 2007, the district court issued an order denying plaintiffs' Motion for Summary Judgment and granting the City's Cross-Motion for Summary Judgment ("Summary Judgment Order"). In so ruling, the court adopted in its entirety and relied upon the Joint Statement of Undisputed Material Facts, as set forth below:

-4-

1.   The City of Memphis ("City" or "Defendant") is a municipality located in Shelby County, Tennessee. (Defendant's Answer to Amended Complaint, ¶ 2.)

2.   City has its own police department, the Memphis Police Department ("MPD"). (Defendant's Answer to Amended Complaint, ¶ 2.)

3.   There are five civil service ranks of officers within MPD, to wit: patrolman, sergeant, lieutenant, major, and inspector. (Code of the City of Memphis, § 2-28-2.)

4.   City has established policies and procedures for MPD, including policies related to promotion within MPD. (Deposition of Dr. Lorene Essex ("Essex Deposition"), dated October 18, 2006, at 9:15-10:14.)

5.   To achieve any civil service rank above patrolman, § 250.1 of the Charter of the City of Memphis requires that officers engage in a promotional testing process (the "Promotional Process") to evaluate their competency for the next highest rank above the existing rank held by said officer. (Code of the City of Memphis, § 3-8-4.)

6.   MPD actively and publicly recruits candidates to be employed by MPD as law enforcement officers. As part of that recruiting process, MPD emphasizes the opportunity to compete for promotions within the MPD as a benefit to potential officer candidates. (Stipulation by Plaintiffs and Defendant.)

7.   Sometime prior to May of 2005, the City determined there was a need for additional Police Majors within MPD. (Defendant's Answer to Amended Complaint, ¶ 7; Essex Deposition at 10:1-22.)

8.   As a result, after considering several different promotional process testing preparation companies, the City engaged Barrett and Associates of Cuyahoga Falls, Ohio ("Barrett and Associates") to prepare and administer a promotional process to recommend candidates for promotions from Lieutenant to Police Major based upon the results of the test. (Essex Deposition at 11:3-14.)

-5-

9.  Barrett and Associates had extensive experience with law enforcement and safety forces such as MPD in terms of writing "content-valid" test items to be included in the Promotional Process. (Deposition of Dr. Gerald V. Barrett, Ph.D., J.D. ("Barrett Deposition"), dated March 9, 2007, at 15:17-16:4; 20:19-21:11.)

10.  "Content-Valid" means that every item included in a test is relevant to the duties of the job to which the test taking candidate is seeking promotion. (Barrett Deposition at 21:6-22:2; 23:5-18.)

11.  Barrett and Associates was engaged by the City to develop three promotional tests for MPD: one each for promotion to the ranks of lieutenant, major, and inspector.  (Barrett Deposition at 20:1-6.)

12.  Every item included in the Majors' Promotional Test is linked to some actual material used by a major in his or her work routine, and all questions were relevant to job duties and performance requirements.  (Barrett Deposition at 21:13-23.)

13.  In developing the 2005 Majors Promotional Process, Barrett and Associates made great efforts to assure that every item included in the Promotional Process was job relevant. Accordingly, Barrett and Associates used subject matter experts ("SMEs") in developing the test.  (Barrett Deposition at 31:24-32:17.)

14.  In this case, SMEs were officers within MPD who at that time held the rank of Major or Inspector, and who were therefore familiar with the duties and responsibilities required of a MPD Major. (Barrett Deposition at 32:1-17.)

15.  Barrett and Associates administered the MPD Major's promotional process on May 15 and 16, 2005. Dr. Gerald V. Barrett ("Barrett") of Barrett and Associates personally supervised the administration of the Major's Promotional Process.  (Barrett Deposition at 36:22-37:5.)

16.  At that same time, Barrett and Associates asked officers who at that time held the rank of major or higher [to] review the Major's promotional process

-6-

to ensure that the officers found the questions included therein to be job relevant. (Barrett Deposition at 32:1-17.)

17. The MPD Inspectors and Majors Promotional Processes were administered at the same time. (Barrett Deposition at 34:10-35:9.)

18. Barrett and Associates prepared a final rank ordering of the persons who participated in the Major's Promotional Process. (Barrett Deposition at 57:1-7.)

19. The Plaintiffs ranked from first (Oakley) to one hundred and first (Palmer) on the final ranking. (Barrett and Associates, Inc. Final Rank-Ordered List ("Major Results"), dated August 25, 2005.)

20. All Plaintiffs applied for and met the minimum qualifications for the rank of Major, a position for which Defendant was seeking applicants. (Defendant's Answer to Amended Complaint, ¶ 23.)

21. Some Plaintiffs belong to a racial minority; some Plaintiffs belong to a racial majority. (Defendant's Answer to Amended Complaint, ¶¶ 21, 31.)

22. Despite their qualifications, the City declined to promote any lieutenants who participated in the Promotion Process from the test results solely because the City Director of Human Resources held the opinion that the test had significant adverse impact upon black and female candidates. (Essex Deposition at 25:3-15; 28:23-29:6; 34:3-15.)[5]

---

[5]In an interview with the Commercial Appeal, a Memphis newspaper, Dr. Essex was paraphrased as stating that the reason for canceling the Promotion Process was because "[i]n short, not enough minority officers scored well enough to be promoted." (Summary Judgment Order at 11.) In a subsequent deposition, Dr. Essex testified that the statement was an accurate interpretation of her view of adverse impact: "I think this is more her summary of what I said. I remember making the comment that there was adverse impact and she said, what does that mean? And I said – of course, she went on to say: Does that mean there were not enough minorities that scored high enough for promotion? And I said, well, that is basically

23. Barrett and Associates performed an extensive validation analysis to confirm the content validity of the promotional process. (Barrett Deposition at 46:1-16.)

24. When the City Director of Human Resources received the final rank ordered list of Police Lieutenants who had gone through the Majors process, she determined that the test scores showed adverse impact. (Essex Deposition at 18:11-22; 19:12-21; 25:3-15.)

25. The City Director of Human Resources referred the question of adverse impact to the office of the City Attorney and was told that the test did not meet the Equal Employment Opportunity Commission's guidelines and prior court decisions to demonstrate numerically a lack of adverse impact. (Essex Deposition at 25:16-21; 25:24-26:6.)

26. The City Director of Human Resources did not seek to validate the Majors process or seek to discover and use Barrett and Associates' validation study, nor did any agent of MPD validate the Majors process or seek to use Barrett and Associates' validation study prior to cancelling the Majors promotional process. (Essex Deposition at 36:7-37:13.)

27. The City Director of Human Resources had no reason to doubt the validity of the process. (Essex Deposition at 15:3-6; 17:18-18:10.)

28. Immediately thereafter, the Director of Police Services issued a memorandum stating that "In light of serious concerns regarding the validity of this test and the results, we cannot proceed with acceptance of the Majors' results or promotions of individuals based on this process. Therefore, this Majors' process is closed and a new process will need to be instituted and promotions made from the new process once the test is developed and given and the rank order list is validated." (Essex

---

what adverse impact means, that there's women, minorities, whatever the mixture, there was adverse impact. And that is all I said." (Id. at 11 n.4.)

Deposition at 28:23-29:13; 29:13-30:3.)

29. The City took no steps to ascertain the validity of the content of the Major's Promotional Process prior to terminating the process. (Essex Deposition at 36:7-37:13.)

30. The City did not contact any other company or organization to help it determine whether the Major's Promotional Process was content-valid. (Essex Deposition at 36:1-37:13.)

31. As part of the 2005 Majors Promotional Process, Barrett inquired and researched whether any alternative selection procedure which had equal content validity and less adverse impact as compared to the 2005 Majors Promotional Process existed; he determined that no such alternative procedure existed. (Barrett Deposition at 45:21-47:3.)

32. Dr. Barrett never did an analysis of adverse impact regarding the test results. (Barrett Deposition at 43:20-44:20.)

33. Dr. Barrett used an identical design and approach with the Inspector's Promotional Process as that which he used in developing the Major's Promotional Process. (Barrett Deposition at 58:21-59:1.)

34. The City promoted majors to the rank of inspector using the 2005 Inspector's Promotional Process. This promotional process showed no adverse impact under any measure regarding this particular group of majors who were promoted to inspector. (Essex Deposition at 11:24-12:3.)

35. After MPD refused to promote any Plaintiff, at least 43 positions for Police Major remain open. (Stipulation by Plaintiffs and Defendant.)

36. The City has been in immediate need of additional supervisors of the rank of Major since 2005, and that need still exists at the present time. (Essex Deposition at 35:13-18.)

37. Defendant continues to seek applicants from persons with plaintiffs' qualifications. (Stipulation by

Plaintiffs and Defendant.)

(Summary Judgment Order at 2-8.)[6]

In its order, the court explained that "Title VII prohibits the preference of one racial group over another" and that "Plaintiffs failed to demonstrate that any one race or gender was preferred over another in the City's decision to cancel the 2005 Major's Promotional Process to support their disparate treatment claim." (Id. at 15.) The court found that the test results showed a significant statistical disparity:

> A formal legal analysis was not necessary for the City to determine that there would be adverse impact due to the dramatic test results and the City's experience with racial employment discrimination cases. One hundred and fifteen Lieutenants took the 2005 Major's promotion test. Sixty-one were black; fifty-four were white; twenty-four were women. According to the rank order listing, of the top twenty-eight, twenty-one were white; seven were black; twenty-seven were males and only one was female. The bottom twenty-eight in the rank order listing consisted of five whites; twenty-three blacks; seventeen were male and eleven were female. The City determined that, even if it promoted 70 out of the 113 candidates, the black-to-white selection ratio would be 20% below the 80% standard set forth in the EEOC regulations.

> Based on these test scores, the City made a decision to "avoid what appeared to be obvious and dramatic adverse impact to blacks and women." Dr. Essex testified that she reached her conclusion that there was adverse impact in part based on the 4/5ths Rule as she understood

---

[6]The City states in its response in opposition to plaintiffs' Renewed Motion for Summary Judgment that in 2007, the City hired Field's Consulting Group to develop a new major promotional examination and that promotions have since been made based on the results of that test, including "most" of the plaintiffs. (Def.'s Mem. and Opp'n to Renewed Mot. for Summ. J. at 9.)

it to be applied in this case.  After consulting with Dr. Gerald V. Barrett, Ph.D., J.D., who conducted the test, and the City Attorney staff, she concluded that there was "severe adverse impact . . . affecting both African-American applicants and female applicants."

(Id. at 16 (internal citations omitted).)

The Court of Appeals affirmed the district court's decision in Oakley v. City of Memphis, 315 F. App'x 500 (6th Cir. 2008). Plaintiffs argued on appeal that the City engaged in intentional discrimination by cancelling the promotional process without first proving that the examination resulted in unlawful disparate impact. The court rejected this argument, stating that "[n]either Title VII nor agency guidelines require a formal finding of disparate impact" and that "[t]he law does not require an employer to validate or certify a process 'where they cannot pinpoint its deficiency explaining its disparate impact under the four-fifths rule simply because they have not yet formulated a better selection method.'" Id. at 503-04 (quoting Ricci v. DeStefano, 554 F. Supp. 2d 142, 156 (D. Conn. 2006)).  In addition, the Court of Appeals, citing the district court's analysis in Ricci, concluded that plaintiffs failed to establish that any discrimination occurred because "the undisputed evidence established that the City's intent in cancelling the promotional process was to prevent the potential for preferential treatment of one race or gender over another." Id. at 504 (emphasis in original).

Plaintiffs then petitioned the United States Supreme Court for

-11-

writ of certiorari.  On June 29, 2009, the Court granted the petition, vacated the judgment, and remanded the case for further consideration in light of its decision in Ricci v. DeStefano, 129 S. Ct. 2658 (2009).  See Oakley, 129 S. Ct. 2860.  The Court of Appeals, in turn, remanded the case to the district court "for further proceedings consistent with the opinion of the Supreme Court."  (D.E. 62.)

**B.    *Ricci v. DeStefano***

In Ricci, the City of New Haven used objective examinations to identify candidates to fill vacant lieutenant and captain positions within the city's fire department.  129 S. Ct. at 2664.  When the results of the examinations showed that Caucasian candidates had out-performed minorities, the city rejected the results based on the statistical racial disparity.  Id.  A group of Caucasian and Hispanic firefighters who had passed the examinations but were denied promotions filed a lawsuit against New Haven and city officials, alleging that defendants engaged in disparate-treatment discrimination by refusing to certify the test results.  Id.  In response, defendants argued that if they had certified the test results then they could have faced disparate-impact liability under Title VII.  Id.  The district court granted summary judgment for defendants, and the Court of Appeals for the Second Circuit affirmed.

The Supreme Court granted certiorari and reversed, determining

-12-

that plaintiffs-petitioners were entitled to summary judgment on their Title VII claim.  The Court began its analysis with the basic premise that the city's decision to not certify the test results, which was a race-based decision, would violate the disparate-treatment provision of Title VII absent some valid justification. Id. at 2673.  As the Court observed, "[w]hatever the City's ultimate aim – however well intentioned or benevolent it might have seemed – the City made its employment decision because of race. The City rejected the test results solely because the higher scoring candidates were white.  The question is not whether that conduct was discriminatory but whether the City had a lawful justification for its race-based action." Id. at 2674.

Recognizing that the disparate-treatment and disparate-impact provisions of Title VII may, at times, "point in different directions," id., the Court held that "before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." Id. at 2677.  Although the Court found that the test results showed a significant statistical disparity between Caucasian and racial minority test takers, this statistical disparity by itself was insufficient to justify the city's race-based decision to reject the test results:

-13-

Based on the degree of adverse impact reflected in the results, respondents were compelled to take a hard look at the examinations to determine whether certifying the results would have had an impermissible disparate impact. The problem for respondents is that a prima facie case of disparate-impact liability – essentially, a threshold showing of a significant statistical disparity, and nothing more – is far from a strong basis in evidence that the City would have been liable under Title VII had it certified the results. That is because the City could be liable for disparate-impact discrimination only if the examinations were not job related and consistent with business necessity, or if there existed an equally valid, less-discriminatory alternative that served the City's needs but that the City refused to adopt. We conclude there is no strong basis in evidence to establish that the test was deficient in either of these respects.

Id. at 2678 (internal citations omitted).

Specifically, regarding whether the examinations were job-related and consistent with business necessity, the Court determined that the city's "assertions to the contrary were 'blatantly contradicted by the record,'" id. (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)), and that the city "turned a blind eye to evidence that supports the exams' validity," including refusing to accept the examinations' designer's offer to provide detailed information to establish the validity of the examinations. Id. at 2679. Regarding whether defendants had a strong basis in evidence of an equally valid, less-discriminatory testing alternative that the city would necessarily have refused to adopt by certifying the test results, the Court found that defendants failed to produce evidence that the score weighting formula used was arbitrary or that an alternative weighting formula would have

-14-

been equally valid.  Id.  The Court further stated that changing
the weighting formula could have violated Title VII's prohibition
of altering test scores on the basis of race.  Id.  Moreover, the
Court rejected defendants' argument that employing "banding" – that
is, rounding scores to the nearest whole number and treating all
candidates with the same whole-number as being of one rank – would
have produced less discriminatory results, because doing so would
have violated Title VII's prohibition of adjusting test results on
the basis of race.  Id. at 2680.  Finally, the Court found that a
few isolated statements made by a testing consultant (who had not
studied the examinations in any detail) did not raise a genuine
issue of material fact that an equally valid, less-discriminatory
testing alternative was available.  Id.  The Court concluded that
"there is no evidence – let alone the required strong basis in
evidence – that the tests were flawed because they were not job-
related or because other, equally valid and less discriminatory
tests were available to the City.  Fear of litigation alone cannot
justify an employer's reliance on race to the detriment of
individuals who passed the examinations and qualified for
promotions."  Id. at 2681.

**C.  Plaintiffs' Renewed Motion for Summary Judgment**

In their motion, plaintiffs argue that this court should, in
light of Ricci, enter partial summary judgment in their favor on

the issue of liability on their Title VII claim.[7]  They contend
that, like the plaintiffs in Ricci, they are victims of disparate-
treatment discrimination, and like the defendants in Ricci, the
City lacked a strong basis in evidence of disparate-impact
liability to justify its decision to reject the results of the 2005
Major Examination.  Additionally, plaintiffs argue that the Supreme
Court's remand order issued in the present case precludes this
court from allowing the parties to engage in additional fact
finding and limits this court's application of the Ricci disparate-
impact justification to the previously established facts.
Plaintiffs also argue that the doctrine of judicial estoppel
prohibits the City from making any factual assertions that directly
contradict the parties' Joint Statement of Undisputed Material
Facts, which was previously adopted and relied upon by the district
court in its Summary Judgment Order.

## II.   PROPOSED CONCLUSIONS OF LAW

### A.   Summary Judgment Standard

Plaintiffs' Renewed Motion for Summary Judgment is governed by
Federal Rule of Civil Procedure 56(c), which provides that "[t]he
judgment sought should be rendered if the pleadings, the discovery
and disclosure materials on file, and any affidavits show that

---

[7]As indicated in footnote 2, supra, all claims at issue in this
case are analyzed under the Title VII framework.  However,
plaintiffs state in their Renewed Motion for Summary Judgment that
they only seek partial summary judgment on their Title VII claim.
(D.E. 68-2 at 7 n.8.)

-16-

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms., Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the court must view all the evidence, facts, and inferences in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## B.   Scope of Remand Order

The Supreme Court's remand order, which granted the petition for certiorari, vacated the judgment, and remanded the case for further consideration in light of Ricci, is known as a "GVR" order. "[A] GVR is appropriate when 'intervening developments . . . reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome' of the matter." Wellons v. Hall, 130 S. Ct. 727, 731 (2010) (quoting Lawrence v. Chater, 516 U.S. 163, 167 (1996)). A GVR order "assists the court

-17-

below by flagging a particular issue that it does not appear to have fully considered, and assists this Court by procuring the benefit of the lower court's insight before we rule on the merits." Id. at 731-32; see also Communities for Equity v. Mich. High School Athletic Ass'n, 459 F.3d 676, 680 (6th Cir. 2006) (stating that "a GVR does not indicate, nor even suggest, that the lower court's decision was erroneous"); Vazquez-Valentin v. Santiago-Diaz, 459 F.3d 144, 147-48 (1st Cir. 2006) (stating that a GVR order "does not resolve a case"); United States v. Norman, 427 F.3d 537, 538 n.1 (8th Cir. 2005) (stating that "[t]he GVR is not the equivalent of a reversal on the merits, however.  Rather, the Court remands for the sake of judicial economy – so that the lower court can more fully consider the issue with the wisdom of the intervening development."); Gonzalez v. Justices of the Mun. Court of Boston, 420 F.3d 5, 7-8 (1st Cir. 2005) (stating that a GVR order "is neither an outright reversal nor an invitation to reverse; it is merely a device that allows a lower court that had rendered its decision without the benefit of an intervening clarification to have an opportunity to reconsider that decision and, if warranted, to revise or correct it").

In the instant case, the GVR order imposes no restrictions on this court's authority to allow the parties to engage in further discovery or to supplement the existing record with additional evidence.  However, the court finds that reopening discovery and

allowing the parties to supplement the record is not warranted.  As discussed below, even if the court were to take into account the additional facts that the City contends support its position, the court, viewing all of the facts and evidence in the light most favorable to the City, finds that the City did not have a strong basis in evidence of disparate-impact liability to justify its decision to reject the test results.  See Ricci, 129 S. Ct. at 2677 ("To succeed on their motion, then, petitioners must demonstrate that there can be no genuine dispute that there was no strong basis in evidence for the City to conclude it would face disparate-impact liability if it certified the examination results.").

## C.   Disparate Treatment in Light of *Ricci*

The disparate-treatment provision of Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1); see also 78 Stat. 255.  As the Court found in Ricci, the City of New Haven chose not to certify the test results because of the statistical disparity based on race, and that absent a valid justification, the city's race-based adverse employment action would violate the disparate-treatment provision.  Ricci, 129 S. Ct. at 2673.

Similarly, in the present case, it is undisputed that (1) when

-19-

Dr. Essex "received the final rank-ordered list of Police Lieutenants who had gone through the Majors process, she determined that the test scores showed adverse impact;" (2) Dr. Essex was told by the City Attorney that "the test did not meet the Equal Employment Opportunity Commission's guidelines and prior court decisions to demonstrate numerically a lack of adverse impact;" and (3) "the City declined to promote any lieutenants who participated in the Promotion Process from the test results solely because [Dr. Essex] held the opinion that the test had significant adverse impact upon black and female candidates." (Joint Statement of Undisputed Material Facts ¶¶ 22, 24, 25.) Based on these undisputed facts, the City's express, race-based decision to reject the test results would violate Title VII, absent a valid justification.

In its opposition brief, the City argues (as it did in its original cross-motion for summary judgment) that "[i]t remains illogical and unprecedented that a plaintiff group composed of white males, black males, white females and black females can successfully prosecute a claim of discrimination under Title VII based upon the same allegedly discriminatory action. . . . The City [] made its decision when faced with severe adverse impact upon African-Americans, both male and female, and females, both Caucasian and African-American." (Def.'s Mem. and Opp'n to Renewed Mot. for Summ. J. at 6.) Although not entirely clear from the

City's brief, it appears the City contends that plaintiffs cannot bring a claim for racial disparate treatment because plaintiffs include both Caucasian and African-American lieutenants, and because the City also rejected the test results based on the statistical disparity between men and women.

With respect to the City's argument that plaintiffs are not entitled to Title VII relief because some plaintiffs are Caucasian and some are African-American, this argument is foreclosed by Ricci, which involved plaintiffs who were Caucasian and Hispanic. Under Ricci, a finding of disparate-treatment discrimination does not depend on the race of the plaintiffs, but rather whether the City took a race-based adverse employment action.  129 S. Ct. at 2673.  As the Court explained, New Haven's decision to reject the test results because too many Caucasian candidates performed better than minority candidates (which was the City's stated justification in the instant case), without some other justification, would violate Title VII.  Id.

With respect to the City's contention that it also rejected the results due to the statistical disparity between men and women, the fact that the City's raced-based decision also happened to be impermissibly based on gender does not negate the fact that the City engaged in disparate treatment on the basis of race.[8]

---

[8]Although plaintiffs include male and female lieutenants, their claims are based solely on race discrimination.

-21-

Therefore, because the City's adverse employment action was based on race, the court must next consider whether the City had a valid justification for its action.

## D.   *Ricci*'s Disparate-Impact Justification

The Civil Rights Act of 1991, 105 Stat. 1071, was enacted to codify the prohibition on disparate-impact discrimination.  Id. The disparate-impact statute provides that a plaintiff can establish a prima facie violation "by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'"  Id. (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).   If the plaintiff demonstrates a prima facie case, the employer must demonstrate that the practice is "'job related for the position in question and consistent with business necessity.'"  Id.   If the employer meets that burden, the plaintiff must show "that the employer refuses an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs."  Id. (citing 42 U.S.C. §§ 2000e-2(k)(1)(A)(ii) and (C)).[9]

---

[9]The Court of Appeals for the Sixth Circuit has described the disparate-impact burden shifting analysis as follows: first, plaintiff must establish a prima facie case of discrimination, i.e., that an adverse impact has occurred.  Isabel v. City of Memphis, 404 F.3d 404, 411 (6th Cir. 2005).  "A prima facie case is established when: (1) plaintiff identifies a specific employment practice to be challenged; and (2) through relevant statistical analysis proves that the challenged practice has an adverse impact on a protected group."  Id. (citations omitted).  If plaintiff establishes a prima facie case of discrimination, "the burden of production lies with the employer to demonstrate a business

Under Ricci, even though the City's decision to reject the
2005 Major Examination results was based on race, the City may
nevertheless avoid disparate-treatment liability if, before
rejecting the test results, it had a strong basis in evidence to
believe it would be subject to disparate-impact liability if it
failed to take the race-based discriminatory action. Id. at 2677-
78 (stating that to avoid disparate-treatment liability, defendants
must have taken "a hard look at the examination[] to determine
whether certifying the results would have had an impermissible
disparate impact"). As the district court and the Court of Appeals
previously found, the evidence supports the City's contention that
there was a significant statistical disparity between the
performance of Caucasians and African-Americans on the examination.
(See Summary Judgment Order at 16); Oakley, 315 F. App'x at 503.
Thus, the City has established a prima facie case that an adverse
impact has occurred. However, "a prima facie case of disparate-
impact liability – essentially, a threshold showing of a
significant statistical disparity, and nothing more – is far from

---

justification for the challenged employment practice." Id. at 413
(citing Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 659-60
(1989)). "[T]he employer must show that the protocol in question
has 'a manifest relationship to the employment' – the so-called
'business necessity' justification." Dunlap v. TVA, 519 F.3d 626,
629 (6th Cir. 2008) (quoting Griggs v. Duke Power, 401 U.S. 424,
431 (1971)). If the employer succeeds, plaintiff must then show
that other tests or selection protocols would serve the employer's
interest without creating the undesirable discriminatory effect.
Isabel, 404 F.3d at 411 (citing Albemarle Paper Co. v. Moody, 422
U.S. 405, 425 (1975)).

a strong basis in evidence that the City would have been liable under Title VII had it certified the results." Id. at 2678. Here, the City could be liable for disparate-impact discrimination only if the examination was not job-related and consistent with business necessity or if there existed an equally valid, less-discriminatory alternative that the City, by certifying the test results, would necessarily have refused to adopt. Id.

The court finds that the City lacked a strong basis in evidence that the examination was not job-related and consistent with business necessity. According to the parties' Joint Statement of Undisputed Material Facts, Barrett and Associates had "extensive experience" with designing content-valid tests for law enforcement and safety forces such as the MPD; every item in the examination was "linked to some actual material used by a major in his or her work routine;" every question on the examination was "relevant to job duties and performance requirements;" Barrett and Associates "made great efforts to assure that every item included in the [examination] was job-relevant;" and subject matter experts – majors and inspectors within the MPD who were familiar with the duties and responsibilities required of a MPD major – were used to develop the examination and review the questions to ensure that they were job-relevant.

Moreover, after plaintiffs completed the examination, Barrett and Associates "performed an extensive validation analysis to

-24-

confirm the content validity of the promotional process;" Dr. Essex "did not seek to validate the Majors process or seek to discover and use Barrett and Associates' validation study, nor did any agent of MPD validate the Majors process or seek to use Barrett and Associates' validation study prior to cancelling the Majors promotional process;" the City "took no steps to ascertain the validity of the content of the Major's Promotional Process prior to terminating the process;" and Dr. Essex "had no reason to doubt the validity of the process." Thus, the undisputed facts show that the City made the decision to reject the test results without having any reason to question the content validity of the examination, without reviewing Barrett and Associates' validation analysis, and without making any attempt on its own to assess the validity of the examination. Id. at 2679 (stating that the city "turned a blind eye to evidence that supports the exams' validity," including refusing to accept the examinations' designer's offer to establish the validity of the examinations).

The court further finds that the City lacked a strong basis in evidence of an equally valid, less-discriminatory testing alternative that the City, by certifying the examination results, would necessarily have refused to adopt. The City stipulated that its decision to reject the test results was based *solely* on Dr. Essex's conclusion that the test had an adverse impact on African-Americans and women and that "[a]s part of the 2005 Majors

-25-

Promotional Process, Barrett inquired and researched whether any alternative selection procedure which had equal content validity and less adverse impact as compared to the 2005 Majors Promotional Process existed; he determined that no such alternative procedure existed." From this evidence, the court can only conclude that no alternative tests existed at the time the City decided to reject the test results, and even if alternative tests existed, the City did not consider them. Further supporting this conclusion, the City has at no time suggested that it ever considered any alternative procedure before it rejected the test results. In addition, because the City did not question the content validity of the examination, did not review Barrett and Associates' validation analysis, and did not attempt on its own to assess the validity of the examination, the City could not have had a strong basis in evidence that there were *equally valid* alternative tests available *before* it rejected the test results.[10] <u>Id.</u> at 2677 (stating that

---

[10]The City points out that while paragraph 31 of the Joint Statement of Undisputed Material Facts indicates that Dr. Barrett determined that no equally valid, less-discriminatory alternative tests existed, paragraph 32 indicates that "Dr. Barrett never did an analysis of adverse impact regarding the test results." If Dr. Barrett did not analyze the adverse impact of the test results, the City questions how he could have determined that a less-discriminatory alternative promotional procedure was not available. Setting aside the obvious question of why the City stipulated to facts that it now contends are inconsistent, the fact remains that the City did not attempt to assess the validity of the examination. Therefore, the City could not have considered whether an equally valid alternative was available before it rejected the test results.

-26-

"before an employer can engage in intentional discrimination . . . the employer must have a strong basis in evidence to believe it will be subject to disparate impact liability").

The City argues that it should be allowed to reopen discovery and supplement the record with additional evidence.  In support of this request, the City attaches an affidavit from Dr. Essex, in which she states that in deciding to reject the test results, she considered not only the Equal Employment Opportunity Commission's four-fifths rule, but also other statistical methods, including the Z-test and D-index, as well as "pooling" by race and gender at the top and bottom of the rank order listing.  Dr. Essex compared the results of the 2005 Major Examination with results from other MPD promotional examinations that violated the disparate-impact provision of Title VII.  See Johnson v. City of Memphis, 355 F. Supp. 2d 911 (W.D. Tenn. 2005); Isabel v. City of Memphis, No. 01-2533, 2003 WL 23849732 (W.D. Tenn. Feb. 21, 2003).  She concluded that the 2005 Major Examination results showed an even greater disparity than the results in the MPD promotional tests at issue in Isabel and Johnson.  Dr. Essex further states in her affidavit that in 2007, the City administered a different major promotional examination developed by Field's Consulting Group, and that the results from that examination "had less adverse impact than the Barrett and Associates examination of 2005."  (Essex Aff. at 2-3, D.E. 74-2.)

The facts contained in Dr. Essex's affidavit do not raise a genuine issue as to whether the City had a strong basis in evidence of disparate-impact liability. Regarding the alternative statistical methods and pooling data, Dr. Essex's consideration of this information pertains only to the statistical disparity and the prima facie case of disparate-impact liability. They do not affect the court's analysis as to whether the examination was job-related and consistent with business necessity or whether an equally valid, less-discriminatory alternative examination was available.

Likewise, Dr. Essex's comparison of the 2005 Major Examination results to the results of the MPD examinations at issue in Isabel and Johnson does not demonstrate that the City had a strong basis in evidence that it would be subject to disparate-impact liability. In Isabel, the court considered whether the 2000 lieutenant promotional process resulted in disparate impact on African-American candidates. 2003 WL 23849732. That process consisted of a written test with a predetermined cutoff score. Those candidates who passed the written portion proceeded to three other components of the process to determine promotion eligibility: a practical video test, performance evaluation scores, and seniority credit. The court determined that there was a statistically significant adverse impact reflected in the written test results, and that therefore plaintiffs had established a prima facie case of discrimination, shifting the burden to the City to show a business

-28-

justification for the use of a written test.  The City failed to show a business justification for a written test with a cutoff score as an initial hurdle in the promotional process.  A study of the validity of the cutoff score was not conducted and testimony showed that the cutoff score was arbitrarily chosen.  Moreover, the content validity studies that were conducted did not show business necessity because the written test, "which operated as an initial hurdle to proceed in the promotion process, only measured one component needed for the job of lieutenant, and not the entire domain."  <u>Id.</u> at *6.  Because the City failed to satisfy the second part of the disparate-impact analysis, the court did not reach the question of whether an alternative procedure existed.  In sum, the court found that plaintiffs "demonstrated by a preponderance of the evidence that the written knowledge test as applied had an illegal adverse impact based on race in violation of Title VII."  <u>Id.</u> at *1.

In <u>Johnson</u>, the court considered whether the sergeant promotional processes for the years 2000 and 2003 resulted in disparate impact on African-American police officers.  355 F. Supp. 2d 911.  The 2000 promotional process involved four factors: a written test, a practical test, performance evaluations, and seniority.  Those candidates who passed the written test were required to take the practical test, but after the City discovered that study materials for the practical test had been leaked, it

-29-

relied only on the written test, performance evaluations, and seniority to make the promotional decisions. The court found that plaintiffs established a prima facie case of disparate impact through statistical evidence of disparity in the written test results, thus shifting the burden to the City to show that the written test was job-related or a business necessity. However, the court found the City did not offer any proof that the written test was job-related or a business necessity. Therefore, the court granted plaintiffs' motion for summary judgment on their Title VII claim of disparate impact as to the 2000 promotional test.[11]

The court notes at least three problems with the City's reliance on these cases. First, while the test results in the instant case may have shown even greater racial statistical disparity than the results in Isabel and Johnson, the City's argument still boils down to raw statistics – in other words, a prima facie case of disparate-impact liability. As discussed above, a prima facie case of disparate-impact liability is not enough. Second, it is inconsequential that the City considered litigation involving different, unrelated police promotional tests in its decision to reject the 2005 Major Examination results. Isabel and Johnson involved different promotional tests,

---

[11]As to the 2003 promotional test, the court granted partial summary judgment for plaintiffs because the City did not dispute that the 2003 test was discriminatory, but instead made the procedural argument that summary judgment on only a portion of the Title VII claim was not appropriate under Fed. R. Civ. P. 56.

administered at different times, and created by different test designers than the promotional test at issue in this case. Although the City was undoubtedly sensitive to the possibility of facing a disparate-impact lawsuit given the decisions in Isabel and Johnson, fear of litigation does not justify disparate treatment, even if disparate-impact litigation is ongoing with respect to other promotional tests administered by the same defendant. Third, while the courts in Isabel and Johnson found that the plaintiffs satisfied their prima facie case of adverse impact and that the City, on both occasions, failed to demonstrate business necessity, the City cannot rely on its prior inability to demonstrate business necessity to show that it could not have demonstrated business necessity for the 2005 Major Examination.

Finally, the City argues that in 2007 it administered a different major promotional examination and that the results from that examination "had less adverse impact than the Barrett and Associates examination of 2005." It is immaterial that the City, after it had already rejected the 2005 Major Examination results, administered a test that may have been equally valid and less discriminatory than the 2005 examination, as the City does not assert that this alternative test was available and considered by the City prior to rejecting the test results.[12] Thus, the existence

---

[12]Dr. Essex's affidavit contains no evidence regarding why she believes the 2005 and 2007 tests were equally valid.

of this alternative examination does not show that the City had a strong basis in evidence of disparate-treatment liability.[13]

In sum, it is clear from the record that the City did not weigh the validity of the process or the availability of alternative processes against the raw statistical disparity before it decided to reject the test results and terminate the promotional process.  While the City may have had a good-faith belief that its actions were necessary to comply with Title VII's disparate-impact provision, a good-faith belief, without more, does not protect the City from disparate-treatment liability.  Ricci, 129 S. Ct. at 2675.

### III.   RECOMMENDATION

For the reasons above, the court recommends that plaintiffs' Renewed Motion for Summary Judgment be granted.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

June 17, 2010
Date

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**

---

[13]Because the court concludes that the City's additional evidence does not raise a genuine issue, the court need not address plaintiffs' argument that the doctrine of judicial estoppel precludes the City from presenting the additional evidence.